UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------x
                                         :
HOULIHAN LOKEY HOWARD & ZUKIN CAPITAL,   :
                                         :
                Appellant,               :
                                         :    05 Civ. 5726 (BSJ)
          v.                             :
                                         :    **Opinion**
HIGH RIVER LIMITED PARTNERSHIP,          :
MEADOW WALK LIMITED PARTNERSHIP,         :
and XO COMMUNICATIONS, INC.              :
                                         :
                Appellees.               :
----------------------------------------x

**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

Appellant Houlihan Lokey Howard & Zukin Capital

("Houlihan") appeals from the March 9, 2005 Memorandum Decision

of U.S. Bankruptcy Judge Arthur J. Gonzalez awarding Houlihan

approximately $4 million in fees related to financial

restructuring services it provided to Appellee XO Communications

("XO"), less approximately $2 million in monthly payments

already paid, for a net fee award of approximately $2 million.

For the reasons stated herein, the decision of the Bankruptcy

Court is AFFIRMED.[1]

---

[1] Materials relied upon in this Opinion include the Bankruptcy Court's
Memorandum Decision ("Mem. Decision"); the Brief of Appellant Houlihan
(Houlihan Br.); the Briefs of Appellees High River Limited Partnership and
Meadow Walk Limited Partnership ("Icahn Br." and "Icahn Reply Br."); the
Brief of Appellee XO Communications ("XO Br."); the Appendix to the Brief of
the Appellant ("Houlihan App."); the Appendix to the Brief of Appellees
("Icahn App."); and the Supplemental Appendix of Appellant ("Houlihan Supp.
App.").

**Background & Procedural History**

XO is a holding company whose subsidiaries provide telecommunications services.  In the years prior to 2002, XO raised approximately $2.5 billion in equity capital through stock offerings, and it incurred approximately $5.7 billion in secured and unsecured debt.  Houlihan is an investment banking firm which engages in financial restructuring services and other lines of business.  High River Limited Partnership and Meadow Walk Limited Partnership (the "Icahn Entities") are affiliates of Carl Icahn.  The Icahn Entities, also Appellees in this action, held substantial quantities of XO's unsecured debt and eventually purchased approximately 85% of the secured lenders' claims against XO.

XO, along with much of the telecommunications industry, encountered severe financial difficulties in 2001.  On October 31, 2001, XO countersigned a letter (the "Engagement Letter") pursuant to which Houlihan agreed to serve as XO's restructuring financial advisor.  (Houlihan App. 2.)  The Engagement Letter provided that Houlihan was to be paid a monthly fee of $250,000 and, in the event that certain restructuring transactions occurred, a transaction fee calculated as a percentage of XO's outstanding debt, reduced by the total amount of monthly fees. (See id.)  The Engagement Letter also provided that, if XO became a Chapter 11 debtor, XO would seek an order authorizing

Houlihan as a professional under Section 328(a) of the Bankruptcy Code.  Houlihan attempted without success to secure the capital necessary to complete the restructuring transactions, and on June 17, 2002, XO filed a Chapter 11 petition.

That same day, XO moved for permission to retain Houlihan as its financial restructuring advisor, as it had agreed in the Engagement Letter.  The Bankruptcy Court approved this petition by order entered August 14, 2002 (the "Retention Order") (See Houlihan App. 9.)  XO also filed a proposed plan of reorganization that day.  The plan addressed two different possible outcomes: the consummation of a restructuring transaction involving the influx of new capital from certain investors ("Plan A"), or the implementation of a stand-alone restructuring without raising any additional capital ("Plan B"). Plan A was significantly more favorable to both the secured and unsecured creditors than Plan B.  Under Plan A, each of the secured creditors would recover 100 cents on the dollar, and each of the unsecured creditors would receive its pro rata share of approximately $200 million, or approximately 8.5 cents on the dollar.  Under Plan B -- the plan that was eventually consummated -- secured creditors were to receive only around 88 cents on the dollar, and unsecured creditors were to receive their pro rata share of certain warrants and nontransferable

rights worth only 1.5 cents on the dollar.  This represented a reduction in value for unsecured creditors of more than 80%. The Retention Order modified the Engagement Letter with regard to Houlihan's fee, granting Houlihan a transaction fee of $20 million if Plan A were consummated, and deferring decision as to the appropriate fee amount if Plan B were consummated.  The Bankruptcy Court never confirmed a specific fee for Plan B -- instead, the reasonableness of a fee for Plan B was to be determined at a subsequent hearing.  By the time the Bankruptcy Court issued the Retention Order, there was no "realistic expectation" that the new financing contemplated under Plan A would actually take place.  (Icahn App. 4, Begeman Dep. 245-46; see Icahn App. 5, Kraus Dep. 286; Icahn App. 6, Horbach Dep. 47-52; Mem. Decision 21 & n.15.)  Plan A was neither confirmed nor consummated.  After amendments, Plan B was confirmed by the Bankruptcy Court on November 15, 2002 and consummated in mid-January 2003.[2]

On February 20, 2003, Houlihan filed its First and Final Application for the Allowance of Compensation and Reimbursement of Expenses (the "Fee Application").  (See Houlihan App. 21.) Houlihan sought a net payment of approximately $18 million, arguing that it was owed a percentage of the total outstanding

---

[2] Upon consummation of Plan B after amendments, unsecured creditors received five percent of the common stock of the reorganized debtor and 10% of any recovery by XO against the potential investors contemplated under Plan A.

debt of $5.7 billion, which included both secured and unsecured debt, less approximately $2 million in monthly fees already paid.  (See Id.)  The Icahn Entities filed an objection to the Fee Application on April 4, 2003.  (See Icahn App. 22.)  XO, which by this time was owned by the Icahn Entities, joined in that objection.  (See Icahn App. 23.)   The Bankruptcy Court held a hearing about the Fee Application on June 13, 16 and July 7, 2003.  The Bankruptcy Court heard live testimony from three witnesses and reviewed three depositions and various exhibits. The Bankruptcy Court issued a Memorandum Decision on March 9, 2005 and an Order on March 21, 2005 approving a gross transaction fee of approximately $4 million.  The Bankruptcy Court employed a fee rate of 40 basis points on XO's secured debt of approximately $1 billion, less the $2 million in monthly fees already paid, for a net transaction fee of approximately $2 million.  Houlihan filed a timely motion for reconsideration on March 31, 2005, which the Bankruptcy Court denied by order entered May 13, 2005.  Houlihan filed a timely notice of appeal on May 23, 2005.

**Discussion**

I.   Standard of Review

This Court reviews a bankruptcy court's conclusions of law de novo and its findings of fact under a clearly erroneous standard.  In re Ionosphere Clubs, Inc., 922 F.2d 984, 988-89

(2d Cir. 1990); Enron Power Mktg. v. Nev. Power Co. (In re:
Enron Corp.), 2004 U.S. Dist. LEXIS 20351, at *2 (S.D.N.Y. 2004)
(Jones, J.).  The Court will accept a bankruptcy court's
findings of fact unless the Court is "left with the definite and
firm conviction that a mistake has been committed."  In re
Schubert, 143 B.R. 337, 341 (S.D.N.Y. 1992).  Reversal is only
justified where "there is no evidence whatsoever to sustain [the
bankruptcy court's] findings . . . ."  In re Nine Associates,
Inc., 76 B.R. 943, 944 (S.D.N.Y. 1987).  A bankruptcy court's
decision with regard to compensation for services performed
during bankruptcy proceedings deserves great deference.  Tenzer
Greenblatt, LLP v. Silverman (In re Angelika Films 57th, Inc.),
246 B.R. 176, 178 (S.D.N.Y. 2000).  Accordingly, this Court
reviews awards of compensation for abuse of discretion.  See In
re Arlan's Dep't Stores, Inc., 615 F.2d 925, 943 (2d Cir. 1979).

II.   The Market-Driven Approach to Fee Awards

    A. Applicable Law

    The parties and the Court agree that the Second Circuit has
established a "market-driven" approach to fees awarded to
professionals under the controlling statute at issue here,
Section 330 of the Bankruptcy Code.[3]  In re Ames Dept. Stores,

---

[3] 11 U.S.C. § 330(a) provides in relevant part:
(1) After notice to the parties in interest and the United States
Trustee and a hearing, and subject to sections 326, 328, and 329, the
court may award to . . . a professional person employed under section
327 or 1103--

Inc. 76 F.3d 66, 71 (2d Cir. 1996) (Congress decided that

"compensation in bankruptcy matters [is to] be commensurate with

the fees awarded for comparable services in non-bankruptcy

cases"), rev'd in irrelevant part Lamie v. United States, 540

U.S. 526 (2004); In re Bennett Funding Group, Inc., 213 B.R.

234, 250 (Bankr. N.D.N.Y. 1997) (same).  The applicant --

Houlihan -- bears the burden of proof on its claim for

---

    (A) reasonable compensation for actual, necessary services rendered
    by the . . . professional person . . . .; and
    (B) reimbursement for actual, necessary expenses.
(2) The court may . . . award compensation that is less than the amount
of compensation that is requested.
(3) In determining the amount of reasonable compensation to be awarded
to . . . [a] professional person, the court shall consider the nature,
the extent, and the value of such services, taking into account all
relevant factors, including--
    (A) the time spent on such services;
    (B) the rates charged for such services;
    (C) whether the services were necessary to the administration of, or
    beneficial at the time at which the service was rendered toward the
    completion of, a case under this title;
    (D) whether the services were performed within a reasonable amount
    of time commensurate with the complexity, importance, and nature of
    the problem, issue, or task addressed;
    (E) with respect to a professional person, whether the person is
    board certified or otherwise has demonstrated skill and experience
    in the bankruptcy field; and
    (F) whether the compensation is reasonable based on the customary
    compensation charged by comparably skilled practitioners in cases
    other than cases under this title.
(4)(A) Except as provided in subparagraph (B), the court shall not
    allow compensation for--
      (i) unnecessary duplication of services; or
      (ii) services that were not--
          (I) reasonably likely to benefit the debtor's estate; or
          (II) necessary to the administration of the case.
    . . . .
(5) The court shall reduce the amount of compensation awarded under
this  section by the amount of any interim compensation awarded under
section 331, and, if the amount of such interim compensation exceeds
the amount of compensation awarded under this section, may order the
return of the excess to the estate.
    . . . .
11 U.S.C. § 330(a).

compensation.  See, e.g. In re Keene Corp., 205 B.R. 690, 695 (Bankr. S.D.N.Y. 1997).

### B. Investment Banking Fees

Investment banks provide various types of services to their clients, for example, mergers and acquisitions ("M&A") services, in which an investment bank arranges the purchase or sale of a business; "financing" services, in which an investment bank arranges new debt or equity financing; and "restructuring" services, in which an investment bank restructures an organization's balance sheet.  In M&A and financing transactions, investment bankers typically receive a small initial retainer and, if the transaction is successful, a success fee calculated as a percentage of the size of the transaction.  (See Houlihan App. 17, Hellmold Report 1-3; Icahn App. 3, Hellmold Tr. 179-183.)[4]

Investment bankers usually employ a different fee arrangement for restructuring transactions like the instant case.  Fees in restructuring cases typically involve a monthly retainer and a transaction fee paid after the restructuring takes place.  (Houlihan App. 17, Hellmold Report 3-6.)  The transaction fee is calculated as a percentage of the face value

---

[4] Ralph Hellmold is the Chairman of The Private Investment Banking Company and was the Icahn Entities' only live witness.  Hellmold has experience with dozens of investment banking transactions, including financial reorganizations and restructurings, mergers and acquisitions, and exchange offers.  (See Houlihan App. 17 Appx. A.)

of some or all of the debt to be restructured.  (Id.)  Sometimes
the transaction fee in a restructuring case is contingent on
raising capital or securing recoveries for creditors.  (Id. at
6.)

### C. Secured vs. Unsecured Debt

#### i. Examples from Other Restructuring Cases

Houlihan argues that the Bankruptcy Court erred by
excluding approximately $4.7 billion in unsecured debt from its
fee calculation and instead basing its fee award only on XO's
approximately $1 billion in secured debt.  Houlihan cites
several examples of restructuring cases in which the investment
bank's fee was based on the total outstanding debt, both secured
and unsecured, not merely the secured debt.  (See Houlihan App.
16 (listing examples); Houlihan App. 4, Hilty Tr. at 107-118
(discussing examples).)[5]  Houlihan argues that the Bankruptcy
Court should have followed these examples and calculated the fee
based on the total debt, not just the secured debt.[6]

In concluding that the fee should be calculated as a
percentage of the secured debt, the Bankruptcy Court reasoned as
follows:

---

[5] Hilty is a Senior Managing Director at Houlihan Lokey.
[6] All the cited examples are bankruptcy cases.  The Icahn Entities argue
that the Court cannot rely on evidence from bankruptcy cases under 11 U.S.C.
§ 330(a)(3)(F).  Houlihan argues that courts routinely rely on evidence from
bankruptcy cases when calculating fees for professionals.  Even giving
Houlihan the benefit of the doubt by assuming arguendo that the Court can
rely on the cited examples, the Bankruptcy Court was within its discretion to
award a fee of $4 million, for all the reasons stated herein.

> [T]he formula [calculating the fee as a percentage of both secured and unsecured debt] is flawed in a situation like the present one, where the largest portion of outstanding debt, is so far "out-of-the-money" that at best it would receive a distribution based more on nuisance value than on financial considerations.  To assume that the market place would ignore that reality is not supported.
> . . . .
> Indeed, at the time the post-petition services were rendered by Houlihan, the restructuring landscape was vastly different from the market conditions that were present when the Engagement Letter was executed.  No evidence was submitted, nor does the Court believe that any credible evidence exists, to demonstrate that the market would have paid the $20 million Transaction Fee for restructuring services in a similar situation and in a similar market environment, where at the outset of the case it was abundantly clear that, inter alia, no financing was, or would be available, to fund a restructuring of the unsecured debt.

(Mem. Decision 21 & n.15.)

Assuming arguendo that the court can rely on the restructuring cases cited by Houlihan, the Bankruptcy Court was well within its discretion to award a fee based solely on the secured debt.  First, the Bankruptcy Court provided ample reasons why, at the time of the Retention Order, the market would have awarded a fee based solely on the secured debt.  The Bankruptcy Court properly found that, at the time it issued the Retention Order, it had become apparent that no new financing would become available to restructure the unsecured debt.[7]  (See Icahn App. 4, Begeman Dep. 245-46; Icahn App. 5, Kraus Dep. 286;

---

[7] This is a factual finding which the Court reviews only for clear error, and the Court finds no clear error.

Icahn App. 6, Horbach Dep. 47-52.)  The Bankruptcy Court then properly reasoned that, in the absence of new financing, projected recoveries for unsecured creditors were so small that the market would never have awarded Houlihan the $20 million transaction fee that it sought.  Based on this reasoning, the Bankruptcy Court properly concluded that the market would have awarded Houlihan a fee based only on the secured debt.  Given the Bankruptcy Court's well-reasoned analysis, its conclusion is not an abuse of discretion simply because it is at odds with the outcome in the cited examples.  Rather, this is precisely the type of market-based fee determination that the Bankruptcy Court was called upon to perform.

Second, the Bankruptcy Court was within its discretion in declining to follow the cited examples because Houlihan has not established that they are factually similar to the instant case. For example, it is unclear whether the bankruptcy courts issued retention orders confirming the fees that they eventually awarded.  If so, those bankruptcy courts would have been hard-pressed not to award the fees they confirmed.[8]  The Bankruptcy Court here had no such pressure because it explicitly deferred the fee calculation in its Retention Order.  There is also no

---

[8] A court may not award a fee different from one that it has approved in a retention order unless it finds that the terms in the retention order were "improvident in light of developments not capable of being anticipated at the time . . . ."  11 U.S.C. § 328(a).  This is a difficult requirement to meet, and courts rarely alter a fee award on these grounds.  In re Yablon, 136 B.R. 88, 92 (Bankr. S.D.N.Y. 1992).

evidence that, at the time the bankruptcy courts in the cited cases issued their retention orders, no new financing would become available to restructure the unsecured debt in those cases.  The Bankruptcy Court here bases its market analysis on this unique aspect of the instant case.  Without evidence that the cited restructuring cases possess these similarities to the instant case, the Bankruptcy Court was well within its discretion in declining to rely on them and instead applying a case-specific market analysis.

Third, the rest of the record -- the record apart from the cited restructuring cases -- shows that the Bankruptcy Court was within its discretion in awarding a fee calculated as a percentage of the secured debt alone.  Fees in restructuring cases are sometimes calculated as a percentage of only part of the company's outstanding debt.  (Houlihan App. 17, Hellmold Report 6 ("The 'transaction' or 'restructuring' fee is usually, but not always, calculated as a percentage of the face value of some or all of the debt in the capital structure . . . .").). Fees in restructuring cases can also be calculated as a percentage of the debt that is actually restructured.  (See id. ("[M]ore normally, [the fee is calculated as a percentage of] only the debt which is restructured . . . ."); Houlihan App. 4, Hilty Tr. at 138:8-13 (calculating fees in restructuring cases "as a percent of the debt restructured is a generally accepted

way of looking at the level of a transaction fee"); Icahn App.
1, Gold Tr. at 41:23-25, 43:10-19 ("We typically look at a
percentage of debt restructured . . . ."); . )[9]  Fees in
restructuring cases are also sometimes contingent on raising
capital or securing recoveries for creditors.  (Houlihan App. 17
at 6.)

     Accordingly, Houlihan has failed to show that calculating
the fee award as a percentage of the secured debt was
inconsistent with market practices, and the Bankruptcy Court did
not abuse its discretion in calculating the fee in this manner.

                    ii. Unsuccessful Outcome

     Houlihan also argues that that the Bankruptcy Court
erred by focusing on the unsuccessful outcome of the
restructuring due to low recoveries of unsecured creditors.
The Bankruptcy Court reasoned as follows:

> The record does not support a finding that the
> restructuring of XO's debt should be termed a
> "success" that would warrant the same, or even
> similar, Transaction Fee for Plan A as for Plan B, in
> view of the fact that the conditions of the
> marketplace were radically different when Plan A was
> negotiated versus when Plan B was negotiated.

(Mem. Decision 17.)

     Houlihan's position is that restructuring transactions
-- unlike M&A or financing transactions -- do not typically
involve fees that are contingent on success, so the

_____

[9] Gold is a Senior Managing Director at Houlihan Lokey.

Bankruptcy Court should not have limited its fee award simply because unsecured creditors received low recoveries. Houlihan also argues that no better creditor recoveries could have been obtained.  (Houlihan Br. 40-41.)

The Bankruptcy Court did not err by taking unsecured creditor recoveries into account, because fees in restructuring cases are sometimes contingent on securing recoveries for creditors.  (Houlihan App. 17 at 6.) Moreover, a bankruptcy court may consider the fact that a professional's services were unsuccessful when calculating a fee award.  In re Angelika Films 57th, Inc., 227 B.R. 29, 42 (Bankr. S.D.N.Y. 1998)("The fact that [a professional's] services are unsuccessful is not a per se reason for denying compensation, although that fact may be taken into consideration in ascertaining the value of [the] services to the estate.")

Even if the Bankruptcy Court had completely ignored the evidence relating to the unsuccessful outcome of the restructuring, it still would have been within its discretion to award a $4 million fee, because it properly calculated the fee award as of the date of the Retention Order.  It is precisely because no better creditor recoveries could have been obtained at the time the

Bankruptcy Court issued its Retention Order that the market would not have awarded Houlihan the fee it sought.

Accordingly, the Bankruptcy Court did not abuse its discretion in taking low unsecured creditor recoveries into account.

### D. Fee Rate

The Bankruptcy Court arrived at its $4 million fee by applying a fee rate of 40 basis points to XO's approximately $1 billion in secured debt.  Houlihan argues that a 40-basis-point rate could arguably have been appropriate if the Bankruptcy Court had based its fee on the total debt, both secured and unsecured, but that a fee based only on the $1 billion in secured debt requires a much higher fee rate, in the range of 70-90 basis points.  Houlihan cites five restructuring cases which involved just over $1 billion in debt.  (See Houlihan Br. 37 (citing cases from Houlihan App. 16 and Houlihan App. 17 at C-2 & C-2(a)).)  These cases involved fee rates ranging from 38.9 to 92.3 basis points.  (See Id.)  The record also shows that small restructuring transactions, i.e. those in the range of several hundred million dollars of debt, typically involve a transaction fee of 100 basis points.  (Houlihan App. 3, Gold Tr. 41:23-42:5; 43:13-19.)  As the deal gets larger, the percentage typically decreases.  (Houlihan App. 3, Gold Tr. 43:18-19).

Assuming arguendo that the Court can rely on the five restructuring cases cited by Houlihan, a fee rate of 40 basis points does not constitute an abuse of discretion because it is within the range of fee rates used in those cases.  The record is devoid of information relating to the underlying facts of the cited restructuring cases, so it is impossible to determine whether the instant case is more similar to the case which involved a fee rate of 38.9 basis points or the four other cases which involved fee rates in the range of 70-90 basis points. Accordingly, the Bankruptcy Court did not abuse its discretion simply because it selected a fee rate on the low end of the range of acceptable fee rates.

### E. Deduction of Monthly Fees Already Paid

Houlihan argues that the Bankruptcy Court should not have deducted approximately $2 million in monthly fees already paid from the total fee award.  However, the record shows that the monthly retainer in restructuring cases is often "at least partially if not fully offsettable against any restructuring transaction fee."  (Icahn App. 17, Hellmold Report at 6.) Accordingly, Houlihan has failed to show that deducting the monthly fees already paid from the total fee award was inconsistent with market practices, and the Bankruptcy Court did not abuse its discretion in deducting the monthly fees.

### III. Secondary Issues

A.  Alleged Inconsistent Application of the Engagement
    Letter

Houlihan argues that the Bankruptcy Court should have given greater weight to the terms in the Engagement Letter, and also that it applied the terms of the Engagement Letter inconsistently.  However, the Bankruptcy Court was in no way bound by the Engagement Letter or any other pre-petition fee arrangement entered into by Houlihan and XO.  See, e.g., In re Intelogic Trace, Inc., 188 B.R. 557, 560 (Bankr. W.D. Tex. 1995) ("[W]e are constrained to apply a 'hindsight' approach, not bound by whatever arrangements might have been worked out prior to retention -- and especially not bound by arrangements made prior to filing [for bankruptcy protection].").  The Bankruptcy Court was bound only by the Retention Order, which expressly deferred decision as to the appropriate fee amount if Plan B were consummated.  (See Houlihan App. 9.)  For all the reasons discussed supra, the fee was reasonable under Section 330 because Houlihan has failed to show that it was inconsistent with market practices.  Accordingly, it is of no consequence that the Bankruptcy Court did not follow the terms of the Engagement Letter or applied them unevenly.[10]

_____

[10] The Engagement Letter explicitly makes itself subject to the Bankruptcy Code:  "In consideration of our services . . . Houlihan Lokey shall be entitled to receive, and the Company shall pay, the following compensation subject, in the case of a Plan, to the requirements of the Bankruptcy Code and Bankruptcy Rules." (Engagement Letter, Houlihan App. 2 at 5.)  The Retention Order specifically provided that "to the extent this Order

### B. Necessary or Beneficial Services under 18 U.S.C. § 330(a)(3)(C) and § 330(a)(4)(A)(ii)

The Court must also determine whether Houlihan's services "were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title." 18 U.S.C. § 330(a)(3)(C). The Court may not award any fee for "services that were not . . . reasonably likely to benefit the debtor's estate; or . . . necessary to the administration of the case." 18 U.S.C. § 330(a)(4)(A)(ii).

Houlihan argues that the Bankruptcy Court contradicted itself with regard to whether Houlihan's services were necessary or beneficial to XO under these statutory provisions. The Bankruptcy Court concluded that Houlihan's services relating to XO's unsecured debt were "necessary and beneficial when rendered" (Mem. Decision 17); were "necessary and beneficial with regard to the unsecured debt" (Mem. Decision 18); and were "beneficial and reasonable and provided some assistance in securing the recoveries for unsecured creditors" (Mem. Decision 19). Later in its Decision, the Bankruptcy Court concluded that "the Court has already determined that Houlihan failed to demonstrate that its assistance regarding a restructuring of any

---

is inconsistent with the Engagement Letter or the Stipulation, the terms of this Order shall govern." (Icahn App. 19, Retention Order ¶ 6.)

of the unsecured debt was 'necessary' at the time such assistance was rendered."  (Mem. Decision 22.)

Whether the latter statement contradicts the former statements is of no consequence to these proceedings because the Magistrate Judge determined that the market would have awarded Houlihan a $4 million fee for all its services -- including restructuring both the secured and unsecured debt.  Assuming arguendo that Houlihan's services relating to both the secured and unsecured debt were "necessary" or "beneficial" under 11 U.S.C. § 330(a)(3)(C) and were "reasonably likely to benefit" XO's estate under 11 U.S.C. § 330(a)(4)(A)(ii), the Bankruptcy Court was still well within its discretion in awarding a $4 million fee.  The Bankruptcy Court properly determined that, because it had become apparent that no new financing would become available, Houlihan's services with regard to the unsecured debt had negligible market value at the time of the Retention Order.  (See supra Part II; Mem. Decision 22 ("[Services relating to the unsecured debt] would not have had the same market value at the time such services were rendered as similar services may have had at the time of commencement of Houlihan's retention under the Engagement Letter.").)  Thus, the market would have awarded a $4 million fee for all of Houlihan's services, including the restructuring of both the secured and unsecured debt, at the time of the Retention Order.  The

Bankruptcy Court did not abuse its discretion because Houlihan
has failed to show that this fee calculation was inconsistent
with market practices.

* * * *

For all the reasons stated herein, the decision of the
Bankruptcy Court is AFFIRMED.  The Clerk of the Court is
directed to close this case.

**SO ORDERED:**

BARBARA S. JONES
**UNITED STATES DISTRICT JUDGE**

Dated:     New York, New York
           April 20, 2007